**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Piramiah Elayaperumal,

Plaintiff,

v.

Medtronic, Inc.,

Defendant.

Civ. No. 02-860 (RHK/SRN)
**MEMORANDUM OPINION AND ORDER**

---

Piramiah Elayaperumal, pro se, for Plaintiff.

Kevin G. Ross and Jacqueline A. Mrachek, Greene Espel, P.L.L.P., Minneapolis, Minnesota, for Defendant.

---

## Introduction

In this lawsuit, Plaintiff Piramiah Elayaperumal, a native of India, complains that his employer, Medtronic, Inc., engaged in racial discrimination in the workplace in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1982, and the Minnesota Human Rights Act, Minn. Stat. § 363.03, subd. 1(2)(c). Elayaperumal alleges that his supervisors at Medtronic refused to provide him with adequate work assignments. He also complains that he withdrew his application for a vacant managerial position because a senior supervisor, allegedly motivated by race, asked him to do so. Elayaperumal further alleges that when he complained in 2000 about discriminatory work assignments, his supervisors retaliated against him by not assigning him any work and by removing from his supervision a technician who reported to him. Finally, Elayaperumal asserts that he received poor performance reviews that were false and did not credit him

FILED JUN 17 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JUN 17 2003
DEPUTY CLERK

with the "excellent work" he performed during the 2000 performance period, including but not limited to his contribution to a process that purportedly saved Medtronic approximately $1.8 million per year.

Before the Court is Defendant Medtronic's Motion for Summary Judgment. Medtronic alleges that Elayaperumal's § 1982 claim fails as a matter of law. As for the remaining statutory claims, Medtronic argues that Elayaperumal has failed to establish a prima facie case of employment discrimination. For the reasons set forth below, the Court will grant the motion.

**Background**

Elayaperumal began working for Avecor Cardiovascular, Inc., in June 1995, as a senior chemist in its research and development group. (Zacharias Aff. Ex. D.) In connection with his June 1998 performance review at Avecor, Elayaperumal complained that he was not being given opportunities to be a team project leader. (Id.) In June 1998, Avecor rated his job performance as a "5" ("meets performance requirements") on a scale of nine, where "9" represented "substantially exceeds performance requirements." (Id.)

Medtronic purchased Avecor in March 1999. (Kriewall Decl. ¶ 2.) As a result of that acquisition, Elayaperumal became a senior chemist in Medtronic's Perfusion Systems business unit, reporting to Eric Thor, the acting director of Research and Development ("R&D") for Medtronic Avecor. (Id.; Zacharias Aff. Ex. F1.) Shortly after the acquisition, Dr. Timothy Kriewall became the head of the consolidated Research and

Development function for Perfusion Systems. (Kriewall Decl. ¶ 2.) Thor – then Elayaperumal's first-line supervisor – reported to Kriewall. (Id.) On July 22, 1999, Kriewall approved Thor's preliminary performance appraisal of Elayaperumal and recommendation to promote Elayaperumal to "pay band 96, Principal Chemist." (Zacharias Aff. Ex. F1.) As a result of the promotion, Elayaperumal's salary increased to $73,735 per year. (Id.)

In approximately August 1999, a position in Perfusion Systems as a Principal R&D Engineer became vacant. (Kriewall Decl. ¶ 3.) Kriewall was the hiring manager for that position. (Id.) In the fall of 1999, Kriewall became aware that Elayaperumal was interested in the position. (Id. ¶ 5.) From personal observation and second-hand reports that he believed were credible, Kriewall had formed the opinion that Elayaperumal lacked essential qualities, including interpersonal skills, for the position of Principal R&D Engineer. (Id. ¶ 6.) Kriewall met with Elayaperumal and suggested that he consider not applying for the position. (Id. ¶ 8.) Kriewall further suggested that Elayaperumal take some courses to increase and enhance his interpersonal skills for management and leadership. (Id.; Ross Aff. Ex. B at 189-91 (Elayaperumal Dep.).) As a result of his conversation with Kriewall, Elayaperumal voluntarily withdrew his application for the position and took some of the skills-building courses suggested by Kriewall. (Ross Aff. Ex. B at 190-91.) Kriewall also invited Elayaperumal to serve on the interview team and review candidates for the open position. (Kriewall Decl. ¶ 9.) Elayaperumal participated

in the selection process. (Id. ¶ 11.)

According to Elayaperumal, his first-line supervisor in the late summer and fall of 1999 was Tony Dziabo.[1] (Compl. ¶ 11.) Dziabo's employment with Medtronic ended in approximately December 1999. (Answer ¶ 11.) Beginning sometime in December 1999, Walter Carpenter acquired oversight responsibility for the coating programs within Perfusion Systems. (Carpenter Aff. ¶ 3.) Carpenter thus became Elayaperumal's first-line supervisor and continued in that role until approximately the summer of 2000. (Id.) Elayaperumal contends that Carpenter treated him differently, refusing to give him work, "eliminat[ing] [him] completely from . . . involvement in any of the Perfusion Systems' projects," subjecting his performance to heightened scrutiny, and giving him a marginal performance rating without having assigned him work on which to base that evaluation. (Pl.'s Mem. Opp'n to Summ. J. at 12.) At the same time, according to Elayaperumal, "majority class" employees in Carpenter's group were given ample work and their performance was not subject to such intense scrutiny.[2]

---

[1] Medtronic has presented evidence that Carpenter was Elayaperumal's first-line supervisor from about August 1999 through approximately July 2000. (Kriewall Decl. ¶ 2.) Kriewall identifies Dziabo as the Director of R&D for Medtronic Cardiopulmonary in Anaheim, California in early 1999. (Id.)

[2] Carpenter avers that, from December 1999 to September 2001, he both made first-hand observations and received second-hand reports from which he concluded that Elayaperumal's interaction with members of the coatings team was terse, unprofessional, and confrontational. (Carpenter Aff. ¶ 3.) According to Carpenter, "[a]fter one particular exchange, I felt it necessary specifically to ask Elayaperumal to apologize to others because, among other things, his approach had . . . been condescending and unprofessional." (Id. ¶ 5.) Elayaperumal admits that Carpenter asked him to apologize to

Medtronic hired Yelena Tropsha to fill the Principal R&D Engineer position; she began work in April 2000. (Kriewall Decl. ¶ 12.) In the late spring of 2000, Carpenter made Tropsha a functional supervisor and assigned Elayaperumal to report directly to her as his first-line supervisor. (Kriewall Decl. ¶ 13; Carpenter Aff. ¶ 3.) On June 9, 2000, after Carpenter assigned Tropsha to be Elayaperumal's first-line supervisor, Elayaperumal met with Kriewall and said that he could not work for Tropsha.[3] (Kriewall Decl. ¶ 14.) Elayaperumal insisted that Kriewall give him a project of his own to manage, with people reporting directly to him, and that he be allowed to report directly to Kriewall.[4] (Id.)

Kriewall prepared and, on June 29, 2000, delivered a written response to Elayaperumal's demand to be given his own project. Kriewall wrote that he believed the "right structure" within Perfusion Systems was to have "one manager focused on coating

---

others. (Ross Aff. Ex. B at 363-64.) Elayaperumal also recounted another occasion when Colleen Stephens from Human Resources directed him to write an apology to the other four or five members of the team for something he said during a meeting. (Id. at 361-63.) Elayaperumal's deposition testimony thus belies his assertion that "[i]n all team meetings, the discussions we had were friendly and strictly limited to technical matters." (Pl.'s Mem. Opp'n to Summ. J. at 6.)

[3] Tropsha avers that, from the outset of her employment as coatings project manager, Elayaperumal openly and frequently challenged many of her decisions and recommendations on projects, both during group meetings and after group meetings. (Tropsha Aff. ¶ 6.) Tropsha further asserts that Elayaperumal presented those challenges in an offensive, unprofessional, and confrontational manner. (Id.) Tropsha also avers that, in team meetings, Elayaperumal would highlight his own expertise and argue with other members of the team; she thus perceived him as failing to interact with others in a constructive and team-building manner. (Id. ¶¶ 7, 8.)

[4] Elayaperumal does not deny making this request to Kriewall in June 2000.

development." (Kriewall Decl. Ex. A at 1.) Kriewall further stated that he was unwilling to create a job for Elayaperumal that did not exist. (Id.) Kriewall indicated that Elayaperumal appeared to be at a crossroads: he could stay in his current position and report to Tropsha or he could search for a new position either within or external to Medtronic. (Id.) If Elayaperumal chose the latter course, Kriewall would support him in a job search. (Id.) If Elayaperumal wished to stay in his present position, he would have to be "willing and able to change [his] behavior and act in a professional, collaborative manner." (Id.) Kriewall identified the following expectations for Elayaperumal if he chose to stay in Perfusion Systems:

> (1) accept and welcome direction from the manager to whom he reported (i.e., Tropsha);
>
> (2) serve as a collaborative team member who actively listens and responds to others in a respectful and collegial manner;
>
> (3) mentor and coach employees on technical questions in a patient and respectful manner;
>
> (4) meet time-lines and commitments on projects;
>
> (5) willingly share information as needed and when requested in a timely and respectful manner;
>
> (6) show more respect for the diversity of the company's workforce; and
>
> (7) refrain from further disruptive confrontations.

(Id.) Elayaperumal remained in Perfusion Systems, reporting to Tropsha.

On June 29, 2000, Kriewall also provided Elayaperumal with his annual

performance evaluation. (Kriewall Decl. ¶ 16.) Elayaperumal received a rating of "Expected" with respect to "Results/ Outcomes Achieved."[5] (Zacharias Aff. Ex. H1 at MDT 0013.) Kriewall noted, however, that with Medtronic's acquisition of Avecor,

> Elaya's role changed from a lead chemist solely responsible for all chemistries within the Avecor milieu to more of a role player in which he has been asked to share both his laboratory and two chemistry associates with other tip-to-tip team members . . . His expected role as a cross-functional team member within the Medtronic organization has presented Elaya with a new management paradigm that has been difficult for Elaya to accept and work within, viz., taking project leadership direction from another chemist. His behavior in cross-functional team meetings has been disruptive, argumentative, and intimidating to others.

(Id. at MDT 0012.) Elayaperumal received a "Needs Improvement" rating with respect to "Medtronic Core Competencies" and his overall performance. (Id. at MDT 0015-16.) Specifically, the performance evaluation identified three areas of improvement:

- Presenting ideas in a non-confrontational way, gaining acceptance by explaining the rationale behind his views. Be open to the ideas and questions of others.
- Gain consensus on experimental approaches.
- Share information freely.

(Id. at MDT 0015.) Elayaperumal responded in writing to his performance review and challenged the assertions that he withholds information and does poorly in cross-functional team interaction, asserting that he was given no specific examples of such

---

[5] The rating system for employee performance at Medtronic at the time had four categories: "Needs Improvement," "Expected," "Commendable," and "Exceptional." (See, e.g., Zacharias Aff. Ex. H1 at MDT 0013.)

conduct. (Zacharias Aff. Ex. H2.)

On August 9, 2000, Kriewall sent a memorandum to Elayaperumal regarding the response to his performance appraisal. (Zacharias Aff. Ex. H3.) Kriewall indicated that he was troubled by Elayaperumal's "total lack of ownership of any aspect of the collaboration and communication problems I have raised with you. I did the best I could to explain in detail at your performance review how your behavior was perceived and has adversely affected other team members."[6] (Id.) Kriewall then referenced his June 29, 2000 memorandum to Elayaperumal:

> Since you have not accepted the offer contained therein, the offer in the memo is considered revoked. With your performance rating as a Needs Improvement, Walt Carpenter and Yelena Tropsha have been directed by me to draft a performance improvement plan that sets out the expectations we have for improvement and captures the methodology for tracking. Hopefully this support will help you more readily meet the expectations I discussed with you.

(Id.)

On August 13, 2000, Elayaperumal sent a memorandum to Colleen Stephens, a manager in Medtronic's Human Resources department, entitled "Seeking a pleasant work atmosphere," which complained of several events in early August 2000 that Elayaperumal

[6] Kriewall also took issue with Elayaperumal's assertion that he [Elayaperumal] was responsible for the decision to abort the Balance project, thus saving Medtronic millions of dollars. Kriewall asserted that Medtronic aborted the project because business needs dictated a shift in strategy, not because Elayaperumal had uncovered a design flaw. (Zacharias Aff. Ex. H3.)

claimed demonstrated that Carpenter and Kriewall were harassing him.[7] (See Second Zacharias Aff. Ex. A.) Stephens investigated Elayaperumal's allegations and found them to be unsubstantiated. (Id.)

On August 14, 2000, Elayaperumal filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR") claiming that he was discriminated against on the basis of national origin, race, and sex.[8] In the charge, Elayaperumal identified the following discriminatory acts:

- In October 1999, he was removed from a project, and that project was assigned to a female employee along with a contract employee. Research and Development Director Tim Kriewall told Elayaperumal that the female employee received the project because she needed project management experience that Elayaperumal already possessed.

- When Elayaperumal applied for a vacant management position, Kriewall asked him to withdraw his application, saying that he would not be considered for the position because he lacked project management skills.[9]

---

[7] In the memorandum, Elayaperumal also complained about "previous incidents" – presumably prior to August 2000. (Pl.'s Mem. Opp'n to Summ. J., Attach. 3.)

[8] Elayaperumal does not claim in his Complaint that Medtronic discriminated against him on the basis of his sex.

[9] This presumably refers to Elayaperumal's interest in the Principal R&D Engineer position that Tropsha filled. The Complaint in this lawsuit does not claim, however, that Kriewall's suggestion that Elayaperumal withdraw his application for the Principal R&D Engineer vacancy was an incident of race/ national origin discrimination. Rather, Elayaperumal alleges that he was told by someone (by whom is not alleged) to withdraw his application for a vacancy created by the departure of first-line supervisor Tony Dziabo in December 1999. (Compl. ¶ 11.) Elayaperumal has come forward with no evidence substantiating that he applied for Dziabo's position. Furthermore, Elayaperumal

- Between January and April 2000, Elayaperumal's Group Director, Walter Carpenter, reassigned a worker whom Elayaperumal had been supervising to another worker (a female) to whom major portions of projects were being assigned.

- Elayaperumal asked Carpenter to assign part of a particular project to him. Carpenter said he was considering assigning the remainder of the project to a new female principal chemist who was beginning employment in April 2000 [presumably, Yelena Tropsha]. Ultimately, however, Carpenter assigned the remaining work on the project to Elayaperumal.

- After Tropsha started work at Medtronic in April 2000 and became manager of the coating department in May 2000, Elayaperumal was ordered to transfer half of his responsibilities to her.

- Elayaperumal's work accomplishments were not reflected in his performance review. He was not given work and responsibilities commensurate with his knowledge and experience.

- As new employees came aboard, Kriewall and Carpenter encouraged them to believe that Elayaperumal did not have good interpersonal and cross-functional team interaction skills.

- Elayaperumal was kept below the staff scientist level and denied the opportunity for an increase in compensation along with other similarly situated employees.

(See Zacharias Aff. Ex. A1.)

On August 31, 2000, Elayaperumal met with Mae Brooks from Medtronic's Workplace Relations department to raise concerns about his June 2000 review. (Second

---

complained to the MDHR *only* that Medtronic's decision to hire Tropsha constituted *sex* discrimination. (Zacharias Aff. Ex. A6.) Because Elayaperumal does not allege sex discrimination in his Complaint, Medtronic's failure to hire him for Tropsha's position is not at issue in this lawsuit.

Zacharias Aff. Ex. B.) Brooks recorded that Elayaperumal attributed his concerns to a "personality clash" with Kriewall. (Id. at MDT 0149.) Brooks concluded that Elayaperumal received a thorough and fair performance review, which indicated that he was seen as a "credible professional with development needed in the area of interpersonal communication." (Id. at MDT 0150.)

In October 2000, Tropsha placed Elayaperumal on a ninety-day performance improvement plan ("PIP"). (Tropsha Aff. Ex. B.) The PIP foreclosed Elayaperumal from pursuing other positions at Medtronic.[10] (Id. at 1.) Tropsha's memorandum regarding the PIP advised Elayaperumal that failure to meet the expectations of the plan could result in disciplinary actions up to and including termination. (Id.) Tropsha identified three areas on which Elayaperumal needed to focus: (1) "competency in interpersonal effectiveness," i.e., demonstrating team-oriented behavior during and outside of group meetings; (2) meeting time-lines and commitments on projects, including providing complete information to team members and supervisors when promised; and (3) accepting direction from Tropsha in her role as his manager, which included refraining from challenging her in her role as team leader in public fora. (Id. at 1-3.)

Medtronic extended Elayaperumal's PIP beyond ninety days because he had spent extended amounts of time away from work due to family issues. (Tropsha Aff. Ex. C at

---

[10] Medtronic's Employment Standards guide specifically states that it is the company's practice that any employee receiving a "needs improvement" rating is not allowed to request a transfer. (See Second Zacharias Aff. Ex. B at MDT 0150.)

1.) On April 3, 2001, Tropsha sent an e-mail to Elayaperumal concerning recent interactions that she felt indicated he was still maintaining a confrontational style of interpersonal interaction. (Tropsha Aff. Ex. D.) Tropsha ultimately concluded, however, that Elayaperumal had improved somewhat in the three key areas identified on the PIP. (Tropsha Aff. ¶ 9.) She provided Elayaperumal with a memorandum dated April 16, 2001, outlining his progress in those areas.[11] (Tropsha Aff. Ex. C at 1-2.) She concludes:

> [Y]our performance seems to have stabilized and you have met most of the expectations of the Performance Improvement Plan: as a result, you will no longer be evaluated under this formal Performance Improvement Plan process. You should feel free to pursue other positions within Medtronic, if this continues to be your choice.

(Id. at 2.)

In May 2001, Tropsha spoke with two female chemists who had been working with Elayaperumal. One chemist, who reported directly to Elayaperumal and is referred to in the record as "Employee Jane," complained that on May 10, 2001, Elayaperumal had told her that he was having problems in his marriage and asked Employee Jane to come and live with him. (Ricci Aff. Ex. A.) Employee Jane flatly refused that proposal. (Id.) Elayaperumal then asked her not to tell anyone about their conversation because he had previously asked the same thing of another female employee – referred to in the record as

[11] Tropsha avers that, soon after removing Elayaperumal from the PIP, he returned to his previous argumentative and confrontational style of interaction and also began to arrive late to work, leave early, and come late to meetings without an explanation. (Tropsha Aff. ¶ 12 & Ex. F.)

"Employee Joan" – and had gotten in trouble for it. (Id.) Employee Jane spoke with Employee Joan, who confirmed that Elayaperumal had also asked her to live with him. (Ricci Aff. Ex. B.) Employee Joan and Employee Jane went to Human Resources on May 14 and May 15, respectively, and reported Elayaperumal's conduct. Tropsha then separated Elayaperumal from the women. (Tropsha Aff. ¶¶ 13-15.)

On May 22, 2001, the person investigating the allegations of sexual misconduct spoke to Elayaperumal about his behavior toward Employees Jane and Joan. On May 31, 2001, Elayaperumal wrote to SurModics, Inc., seeking a job. (Ross Aff. Ex. A at 41-43.) On June 5, 2001, Jon Berry of Medtronic's Human Resources Department provided a final written warning to Elayaperumal that his conduct constituted a violation of Medtronic's policy on sexual harassment. (Zacharias Aff. Ex. K.)

On June 12, 2001, Tropsha delivered to Elayaperumal a memorandum regarding his performance evaluation for the period from July 2000. Tropsha identified several deficiencies and told Elayaperumal that he would again receive an overall rating of "Needs Improvement." (Tropsha Aff. Ex. F.) Tropsha commented on the deterioration in his performance soon after being removed from the PIP. She noted that some of the analytical protocols assigned to Elayaperumal six months earlier had not been completed. (Id.) Furthermore, his recent episode of "Offensive Conduct" had created an extremely uncomfortable work environment, causing Tropsha to assign him to a different project and thus compromising priorities on the Tip-to-Tip program. (Id.) Tropsha informed him

that he needed to show significant improvement in the areas of personal integrity, interpersonal effectiveness, quality orientation, and results orientation within the next three months or face termination. (Id.)

Elayaperumal accepted SurModics's offer of employment on August 13, 2001. (Ross Aff. Ex. A at 35-36.) On September 5, 2001, he tendered his resignation to Medtronic, effective September 14. (Zacharias Aff. Ex. I.) On September 12, 2001, he began work at SurModics, as a "Senior I Scientist," earning an annual salary of $75,000 plus a one-time signing bonus of $2,500. (Ross Aff. Ex. A at 35-36.)

The MDHR made a finding of no probable cause with respect to Elayaperumal's charge of discrimination on December 17, 2001. (Zacharias Aff. Ex. A.) Elayaperumal appealed that decision and, on February 22, 2002, the MDHR affirmed its determination.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and

the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.[12] See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Count I of Elayaperumal's Complaint alleges employment discrimination and retaliation in violation of Title VII and 42 U.S.C. §§ 1981 and 1982. Count II alleges that Medtronic's conduct violated the Minnesota Human Rights Act, Minn. Stat. § 363.03, subd. 1(2)(c).[13] The Court begins with Elayaperumal's § 1982 claim.

---

[12] Elayaperumal represents himself in this action. At the end of his memorandum in opposition to the summary judgment motion, he included a declaration that "under penalty of perjury . . . the foregoing is true and correct to the best of my knowledge." (Pl.'s Mem. Opp'n to Summ. J. at 14.) To the extent that he has made factual assertions in that memorandum that are based on first-hand knowledge, the Court will consider those facts to be properly in the record. The Court will not, however, credit assertions made by Elayaperumal about what co-workers felt, said, or believed, or about what such persons might say if called to testify. Such assertions are not admissible evidence. See Fed. R. Evid. 602, 802.

[13] Elayaperumal also alleges in "Count III" of his Complaint that "[i]n as much as the subjective performance rating discourages transfer of employees within . . . Medtronic, they are [sic] anti-competitive in nature and disporportionately impact racial minorities and employees of foreign origin." (Compl, Count III.) Medtronic argues that this count fails to state a claim upon which relief can be granted. Elayaperumal did not address the merits of "Count III" in his opposition memorandum, providing no authority for his "anti-competition" theory or evidence of disparate impact. Accordingly, count III of the Complaint will be dismissed.

## II. Violation of 42 U.S.C. § 1982

Section 1982 of Title 42 of the United States Code provides, in pertinent part, that "[a]ll citizens of the United States shall have the same right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Medtronic argues that Elayaperumal cannot, as a matter of law, state a claim for relief under § 1982 because he was an at-will employee and thus, had no property interest in his job at Medtronic. The record bears out Medtronic's factual assertion that Plaintiff was an at-will employee, and he does not dispute that fact. Under Minnesota law, an at-will employee has no property interest in continued employment in his or her position. Reierson v. City of Hibbing, 628 N.W.2d 201, 204-05 (Minn. Ct. App. 2001); Rutherford v. County of Kandiyohi, 449 N.W.2d 457, 460 & n.1 (Minn. Ct. App. 1989). Thus, Elayaperumal cannot assert a claim for the discriminatory deprivation of a property interest under § 1982. See Skeets v. Johnson, 816 F.2d 1213, 1214-15 (8th Cir. 1987) (reaching same conclusion in case involving Arkansas law). The Court will dismiss Elayaperumal's § 1982 claim with prejudice.

## III. Violation of Title VII, 42 U.S.C. § 1981 and the Minnesota Human Rights Act

Elayaperumal contends that the only reason for Medtronic's refusal to give him certain project assignments and for giving him a low performance rating in June 2000 was an illegal reason: his race and/or national origin. He does not assert that other, legitimate factors were at play in those decisions, such as actual problems in his performance;

indeed, he categorically denies that his performance was deficient in any way.

Accordingly, this is strictly a pretext case, and the Court will evaluate Elayaperumal's remaining discrimination claims under the McDonnell Douglas burden-shifting analysis. The elements of a discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Minnesota Human Rights Act ("MHRA") are the same. Saulsberry v. St. Mary's Univ., 318 F.3d 862, 866 (8th Cir. 2003); Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001); Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1997). The Court's analysis of those claims under McDonnell Douglas begins with the plaintiff, who must present a prima facie case of discrimination. If he does so, "the employer must rebut the presumption of discrimination that his prima facie case raises by articulating a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, the burden of production shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual." Burkett v. Glickman, 327 F.3d 658, 661 (8th Cir. 2003).

In order to present a prima facie case of employment discrimination based on race or national origin, the plaintiff must establish that (1) he is a member of a protected class; (2) he was qualified for his position and performed his duties adequately; and (3) he suffered an adverse employment action under circumstances that would permit the court to infer that unlawful discrimination had been at work. Habib v. NationsBank, 279 F.3d 563, 566 (8th Cir. 2001). Medtronic acknowledges that Elayaperumal is a member of a

protected class. As for the remaining elements of the prima facie case, Medtronic contends that Elayaperumal was not performing his duties adequately and that he suffered no adverse employment action. The Court determines that it need not address whether Elayaperumal was performing his duties adequately because there is no issue of material fact as to whether he suffered an "adverse employment action" sufficient to support a claim of employment discrimination. He did not.

Not every action that makes an employee unhappy is an "adverse employment action." An adverse employment action exists where there is "a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities." Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000). Thus, to constitute an "adverse employment action" the employer's conduct must have been "more disruptive than a mere inconvenience or an alteration of job responsibilities or changes in duties or working conditions that cause no materially significant disadvantage." Nash Finch Co., 123 F.3d at 1060 (quoting Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (holding no adverse employment action where plaintiff was reassigned without diminution in title, salary or benefits)).

Elayaperumal complains that he did not receive assignments that he desired and believed were commensurate with his skills or abilities. Such action by an employer is not, however, an "adverse employment action," Jacob-Mua v. Veneman, 289 F.3d 517, 522 (8th Cir. 2002), particularly where, as here, there is no evidence that Elayaperumal's

salary, title, benefits, or other terms of employment changed materially as a result of not receiving certain projects.

As for Elayaperumal's low June 2000 performance review, there is similarly no evidence that the review produced a reduction in his salary, benefits, or responsibilities. See LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 692 (8th Cir. 2001) (holding that "a negative review is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment"). At most, Elayaperumal complains that he received no raise in June 2000. That is not sufficient, however, to constitute an "adverse employment action." Tademe v. Saint Cloud State Univ., 328 F.3d 982, 992 (8th Cir. 2003) (holding that decision not to raise plaintiff's salary was not an adverse employment action because his salary was not decreased or otherwise diminished in any way).

Even if the review did rise to the level of an "adverse employment action," however, Elayaperumal has not demonstrated that the review occurred under circumstances that give rise to an inference of discriminatory intent. Elayaperumal has made only a vague and conclusory allegation that Carpenter treated "majority class" employees differently from him; Plaintiff has presented no evidence demonstrating that Kriewall evaluated the performance of any "majority class" employee of similar rank and

responsibility differently or more leniently than Elayaperumal's performance.[14] Accordingly, the Court will dismiss the claims of discrimination under Title VII, § 1981, and the MHRA.

## IV. Retaliation

To prove a prima facie retaliation claim, Elayaperumal must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action and (3) there exists a causal connection between protected activity and the action. Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir. 2001). As set forth above, "[a]dverse employment actions must have a 'materially adverse impact' on the plaintiff's terms or conditions of employment." Id.

Elayaperumal fails to identify with any precision when he first engaged in any protected activity, such as complaining to Medtronic about alleged racial or national origin discrimination.[15] (See Pl.'s Mem. Opp'n to Summ. J. at 6.) The record, however, establishes that Elayaperumal filed a charge of discrimination with the MDHR on August

---

[14] Indeed, Kriewall – who gave Elayaperumal his June 2000 performance review – is the same person who, less than one year earlier, approved Elayaperumal's promotion to "pay band 96, Principal Chemist" and the substantial pay increase associated therewith. Kriewall's favorable employment action less than one year before the alleged adverse employment action seriously undercuts any inference that Kriewall's performance review was motivated by a race-based or national origin-based animus toward the Plaintiff.

[15] Elayaperumal asserts in his opposition memorandum that he filed a complaint of discrimination with the MDHR on June 10, 2000. (Pl.'s Mem. Opp'n to Summ. J. at 2.) The record does not support that assertion; rather, the evidence establishes that Elayaperumal signed his Charge of Discrimination on August 11, 2000. (Zacharias Aff. Ex. A1.)

14, 2000. Accordingly, the Court considers those incidents occurring after August 14, 2000 as potential "adverse employment actions" upon which a claim of retaliation could be based.

Elayaperumal claims that after Medtronic received notification from the MDHR of his discrimination charge, his managers retaliated against him in several ways. He was not given projects; instead, Medtronic promoted one of Plaintiff's technicians to the rank of chemist and gave that individual projects. (Pl.'s Mem. Opp'n to Summ. J. at 3.) Elayaperumal further asserts that, in retaliation for his charge of discrimination, he was not allowed to complete the writing of two patents that had been approved by the managers a few months earlier. (Id. at 2.) Elayaperumal also complains that he was asked to leave a technical presentation made by an outside vendor, even though he had been designated as the consultant to the coating group. Elayaperumal contends that he "was not recognized again in his year 2001 performance review" for a contribution that allegedly saved Medtronic millions of dollars. (Compl. ¶ 15.) Finally, Elayaperumal claims that the following other acts were retaliatory in nature:[16]

- Medtronic did not allow him to apply for a transfer to the other divisions of the company;

---

[16] Elayaperumal also complains that his son's application for a student fellowship at Medtronic was denied. (See Pl.'s Mem. Opp'n to Summ. J. at 10.) There is no evidence establishing any link between Elayaperumal's complaints of employment discrimination and the evaluation of his son's fellowship application. Indeed, there is no evidence that those who decided on his son's application knew of Elayaperumal or his complaints of discrimination.

- Medtronic did not allow him to write for grants;
- Medtronic did not allow him to present his Trillium Optimized Oxygenator process optimization work to an internal scientists' gathering at Medtronic;
- Medtronic did not consider his applications for jobs within the company after the 2000 probation period was lifted.

(Pl.'s Mem. Opp'n to Summ. J. at 10.)

None of the above constitutes an "adverse employment action." As discussed above, there is no evidence that Elayaperumal's not getting the assignments he wanted caused him a *materially* significant disadvantage with respect to salary, benefits, title or responsibilities. Elayaperumal does not identify who denied him the opportunity to finish writing the patents, or when this occurred. His assertion that he was denied the opportunity to write for grants is similarly vague and conclusory. Being asked to leave a meeting on one occasion, and not being allowed to make a presentation at one internal program are *de minimus* acts; there is no evidence that these actions caused Elayaperumal a material significant disadvantage with respect to his terms and conditions of employment.

Finally, with respect to Elayaperumal's claim that he was precluded from applying for other positions within Medtronic, the record reflects that (a) he was so precluded because he had been placed on a PIP, and (b) it is Medtronic's standard policy to preclude all employees who are on a PIP from applying for a transfer. Elayaperumal has nowhere

alleged that being placed on the October 2000 PIP was itself was a retaliatory act; indeed, Elayaperumal does not acknowledge in his memorandum that he was in fact placed on a PIP in October 2000. Thus, there is no evidence that Medtronic's refusal to allow Elayaperumal to apply for positions within Medtronic has any causal connection to his complaints of employment discrimination. Plaintiff's retaliation claim fails.

## V. Constructive Discharge

Elayaperumal argues that Medtronic's conduct toward him was "unbearable" and, because his supervisors gave him "no work" and "methodically inhibited" every effort he made to augment his technical skills, he was forced to leave Medtronic. (Pl.'s Mem. Opp'n to Summ. J. at 11.) Significantly, although Elayaperumal applied for his present job in June 2001 and tendered his resignation to Medtronic in September 2001, he made no allegations of constructive discharge in the Complaint he filed in April 2002. Although this claim could have been raised at the outset of this litigation, it was not. The claim is not properly before the Court. Furthermore, Elayaperumal has not presented evidence from which a reasonable jury could conclude that his working conditions were so intolerable that a reasonable person would feel compelled to resign. See Hutchins v. International Bhd. of Teamsters, 177 F.3d 1076, 1082 (8th Cir. 1999); E.W. Blanch Co., Inc. v. Enan, 124 F.3d 965, 970 (8th Cir. 1997) (holding that the "intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings"). Elayaperumal is not entitled to a trial on a constructive discharge claim.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant Medtronic, Inc.'s Motion for Summary Judgment (Doc. No. 8) is **GRANTED.** Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated June 17, 2002

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995